Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Attorneys for Plaintiffs Compass, Inc. and Compass California II, Inc.

(Additional counsel on signature page)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| COMPASS, INC. and COMPASS CALIFORNIA II, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>CONTRA COSTA ASSOCIATION OF REALTORS®,<br><br>Defendant. | Case No. 4:26-cv-13655<br><br>**COMPLAINT FOR VIOLATION OF 15 U.S.C. § 1 AND RELATED CAUSES OF ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked in Contra Costa and Alameda Counties (the "East Bay") because of rules set and enforced by Defendant Contra Costa Association of REALTORS® ("CCAR"). A large majority of the voting members of CCAR's Board of Directors are direct competitors of Compass and its agents, and they are dictating how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how homeowners can and cannot market their own homes. Plaintiffs bring this lawsuit under 15 U.S.C. § 1 and related state law to stop CCAR's anticompetitive behavior.

2. Homeowners want a choice. Plaintiffs Compass, Inc. and Compass California II, Inc. (collectively, "Compass") offer a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact, Compass requires the homeowners' written approval to publicly market outside of CCAR. Under California law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the MLS and the MLS sends the listing to every real estate website and data vendor in the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners

love this choice: where MLSs allow phased marketing, approximately 48% of Compass homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as CCAR requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. CCAR, a REALTOR® trade association that operates its own multiple listing service, is a combination of Compass' direct competitors, and it is controlled by a Board on which a large majority of the voting directors are Compass' direct competitors. Under the CCAR rules, once a homeowner markets the home anywhere on the internet, posts the home anywhere on social media, holds a single open house, provides the listing to an agent outside of their company, or publicly markets the home in any way CCAR defines as "public marketing," the listing must be given to CCAR and its co-conspirators within one business day, and the agent and homeowner must follow hundreds of CCAR restrictions—even if the homeowner gave the agent a lawful marketing instruction that conflicts with the CCAR rules.

5. Although California law states that real estate agents owe their clients a fiduciary duty of "utmost care, integrity, honesty, and loyalty," including a duty to follow their lawful instructions,[1] if a real estate agent follows the client's lawful instruction to publicly market a home outside of CCAR, the agent then faces fines of up to $2,000 per violation, automatic suspension, or expulsion from the very MLS they need to do business. More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC") warned that when an MLS forces members to submit their listings, "[a]lternative methods of selling houses are effectively foreclosed."[2] That is what CCAR has done.

6. Compass brings this lawsuit to stop these illegal rules. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what CCAR is doing: using control of a home listing database that real estate agents in the East Bay

---

[1] *See Thomson v. Canyon*, 198 Cal. App. 4th 594, 607 (2011).

[2] FTC, *The Residential Real Estate Brokerage Industry* 130 (Dec. 1983) ("Butters Report").

cannot work without, CCAR and its co-conspirators block Compass' better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its anticompetitive rules, CCAR has maintained them and, in September 2025, tightened them further. CCAR's excuses for punishing agents for phased marketing are meritless. In fact, MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues MLSs like CCAR claim will result from pre- or off-MLS public marketing have not transpired. CCAR itself operated without a Clear Cooperation rule until May 1, 2020. Before then, its mandatory-submission rule did not regulate public marketing at all.[3] But now, MLSs like CCAR claim that their rules prevent "free-riding" and promote "transparency."[4] CCAR does not care about homeowners; it is a members-only database that homeowners are unable to access and that fines agents just for following their client's lawful public marketing instructions.[5] Moreover, Compass does not "free ride" as those MLSs claim. Compass agents pay CCAR dues and contribute their listings to CCAR.

8. CCAR and its co-conspirators have caused significant economic harm to Compass and its agents, in addition to the immense harm CCAR has caused to homeowners. Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm CCAR and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like CCAR's foreclosed the option for Compass' agents to publicly market a home without giving it to CCAR, thus forcing them to follow CCAR's policies. Although the settlements were the result of MLS rules, CCAR paid nothing. CCAR forces Compass and its agents to give their valuable home listing data to CCAR,

---

[3] *Clear Cooperation Policy – MLS Rule Change 7.5*, CCAR (Apr. 30, 2020), https://ccartoday.com/clear-cooperation-policy-mls-rule-change-7-5 ("2020 Clear Cooperation Announcement") (quoting then-current CCAR MLS Rule 7.5).

[4] *See Cal. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-08796-MKV, ECF No. 13 ¶ 51(a), (d) (S.D.N.Y. Oct. 27, 2026) (first amended complaint).

[5] Contra Costa Ass'n of REALTORS®, Multiple Listing Service Rules and Regulations (amended eff. July 6, 2026) ("CCAR MLS Rules"), Rules 4.1, 4.1.1(a), 4.2, 4.2.1(a)–(b), 11.7, 12.12; *see also What is an MLS?*, CCAR, https://ccartoday.com/what-is-an-mls.

which CCAR then sells and licenses to third parties and makes available to real estate portals and other companies that earn hundreds of millions of dollars displaying Compass listings, all while paying Compass nothing.[6] Because Compass is subject to CCAR's rules, Compass has lost commissions on listings and agents it could not win without the ability to offer See It First™ on Compass, as well as ancillary revenue (such as mortgage, title, and escrow). All of these harms, and any others caused by CCAR's illegal rules, must be paid back threefold, and the illegal rules must be enjoined.

**NATURE OF THE CASE**

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers and agents that make rules governing competition among them.[7] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[8] As the FTC noted in its seminal report on U.S. residential real estate, the people who control the MLS "control . . . the most important aspects of brokerage practices."[9] That control has been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that fixed commission rates.[10] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the

---

[6] About, REdistribute, https://redistribute.com/about (listing "Contra Costa Association of REALTORS" among REdistribute's "MLS Licensors") ("REdistribute About Page"); REdistribute, Cal. Reg'l Multiple Listing Serv., https://go.crmls.org/redistribute/ ("CRMLS REdistribute Page").

[7] Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

[8] *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980).

[9] Butters Report at 15.

[10] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).

FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[11] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[12]

11. CCAR is a REALTOR® trade association that operates its own multiple listing service, with a membership of thousands of competing brokers and agents.[13] CCAR shares a single listing platform with Bay East Association of REALTORS® ("Bay East") and BridgeMLS, Inc. ("BridgeMLS"), which CCAR identifies, along with itself, as the MLSs serving the East Bay.[14] CCAR is governed by a Board of Directors with twelve voting seats, each of which must be held by a licensed REALTOR® member.[15] CCAR's current voting directors are affiliated with real estate brokerages, and a large majority of them are brokers or agents who compete with each other and with Compass and its agents.[16]

12. For decades, CCAR has been an unavoidable and dominant feature of residential real estate brokerage in Contra Costa County. Participation in CCAR, or in one of the MLSs with which it shares its listing platform and rules, is essential for any real estate agent to work in the East Bay; real estate agents cannot effectively represent clients in those areas without being members of one of those MLSs subject to the same rules. While many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to

---

[11] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

[12] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009).

[13] *CCAR Home*, CCAR, https://ccartoday.com ("CCAR Home Page").

[14] *NorCal MLS Alliance*, CCAR, https://ccartoday.com/mls-resources-information/norcal-mls-alliance ("Alliance Page").

[15] Bylaws of the Contra Costa Ass'n of REALTORS® art. X, §§ 3–4, 8(a) (eff. June 26, 2026) ("CCAR Bylaws").

[16] *2026 CCAR Board of Directors*, CCAR, https://ccartoday.com/about/board-of-directors.

belong to the MLS in the area where they work. Thus, agents cannot survive in business without participating in the MLS.

13. Showing CCAR's market power, agents must follow CCAR's rules or CCAR will fine and punish them, potentially by exclusion from CCAR. CCAR polices its members through a Grievance Committee and a Professional Standards Committee, both composed of competing REALTORS®, that review and adjudicate alleged violations of its MLS rules. CCAR encourages competing agents to report to CCAR any rule violations by their competitors for punishment.[17] While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because CCAR membership is critical to their business and because it blunts competition they might otherwise face without the MLS rules.

14. CCAR Rules 7.5 and 7.5(a) specifically block competition among brokers and agents, and homeowner choice. Rule 7.5 forces homeowners, brokers, and agents to give CCAR their listings and forces them into all of the CCAR restrictions: it requires the listing broker to input into the MLS every exclusive right-to-sell or seller-reserved listing of one-to-four-unit residential property or vacant lots in the MLS service area within two days after the seller signs the listing agreement (or the listing's start date, if later). One of those restrictions, Rule 7.5(a), dictates how a homeowner can publicly market their property. Once homeowners and agents market the property to "the public"—which CCAR defines as anyone outside the listing brokerage and its clients—the listing must be submitted to CCAR within one business day. Rule 7.5 defines that marketing to include signs, websites, social media, email or text campaigns, brokerage or franchise listing-sharing networks, flyers, applications, open houses, or any other means.[18] Even though CCAR does not own the home or represent the homeowner, CCAR dictates how the homeowner and their agent must sell the home.

15. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how CCAR directs (a choice

---

[17] CCAR MLS Rules 14–15 & app. B ¶ J; CCAR Bylaws art. XII, § 1; *CCAR Committees*, CCAR, https://ccartoday.com/ccar-committees ("CCAR Committees Page").

[18] CCAR MLS Rules 7.5, 7.5(a).

between two extremes: listing it immediately through an MLS and incurring the disadvantages described above; or not publicly marketing the home at all). Through these rules, CCAR and its co-conspirators control how homeowners and agents market properties both on and off CCAR. CCAR and its co-conspirators, thus, control home marketing across the entire real estate industry in the East Bay.

16. These rules stand directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing, it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a “Coming Soon” listing, and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. Phase One is blocked, and Phase Two is curtailed, by CCAR rules. Phase One listings cannot be publicly marketed. And although CCAR permits public marketing of a listing once it is entered in CCAR’s “Coming Soon” status, a Coming Soon listing must be disclosed to every participant in the MLS; it is cancelled automatically after thirty days; it is excluded from the MLS’s open house and broker tour modules; if the homeowner does not want other agents to show the home, the listing agent may not show it either; and once a listing goes active, it cannot return to Coming Soon status.[19]

18. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the homeowner’s sales pitch to buyers) the history of price changes and days on market, which are perceived by buyers as signaling homeowner desperation. Having price changes and days on market in the homeowner’s own advertisement often prevents homeowners

[19] CCAR MLS Rules 9.1.1, 10.1.1(3)–(5), (7)–(9), (12).

from obtaining the full value of their property. This is unique to residential real estate: sellers of other goods are not forced to include, in their advertisements, price changes or how long the good has been for sale. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (who make up and control CCAR) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they can offer to their clients.

19. CCAR Rules 7.5 and 7.5(a) unreasonably restrain trade in two ways. CCAR's agent members, including its Board members, compete directly with one another and with Compass' agents for homeowners, and CCAR Rules 7.5 and 7.5(a) block competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported in its landmark study of residential real estate in the United States, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[20] Moreover, CCAR is blocking competition between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why CCAR Rules 7.5 and 7.5(a) violate the law. As recognized by the FTC in its seminal report on residential real estate, to comply with the antitrust laws, an MLS must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed in California for over 50 years.[21] For example, the "Fourteen

---

[20] Butters Report at 130.

[21] *Id.* at 129–30.

Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR"), which governs CCAR, expressly provides that an "MLS shall not: *Make any rule regulating the advertising or promotion of any listing*,"[22] and preserves an alternative to the MLS, which it calls an "office exclusive."[23] Before CCAR adopted Rule 7.5(a) in 2020, CCAR's mandatory-submission rule did not regulate public marketing at all; it required only that the listing broker either input the listing or submit a seller-signed exclusion.[24] On information and belief, that rule imposed no restriction on how an excluded listing could be publicly marketed.

21. The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings [like CCAR Rule 7.5]. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[25] CCAR Rules 7.5 and 7.5(a) violate the Fourteen Points antitrust policy and cause the exact competitive injury about which the FTC warned. The DOJ commented on a policy similar to CCAR's Rule 7.5(a) that the "[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services."[26] The DOJ's comment echoed the FTC's 1983 conclusion that "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[27]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of CCAR's combination

---

[22] *Id.* at 134 n.354 (emphasis added).

[23] *Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

[24] 2020 Clear Cooperation Announcement (quoting then-current CCAR MLS Rule 7.5).

[25] Butters Report at 130.

[26] *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

[27] Butters Report at 130.

of competitors have forced upon the industry. But CCAR blocks that choice and the competition that choice would bring.

23. CCAR and its co-conspirators have harmed brokers and agents including Compass, its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving the commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process; (2) cannot benefit from marketing strategies that, on average, provide them with a 4.6% higher sale price, 34% fewer days on the MLS, and 29% fewer price cuts; and (3) cannot benefit from the fiduciary duty agents owe to their clients of "utmost care, integrity, honesty, and loyalty."[28]

24. CCAR has no valid justifications for its illegal conduct. Any claim CCAR makes is undermined by recent history: CCAR did not adopt its Clear Cooperation rule until May 1, 2020.[29] Before then, CCAR's mandatory-submission rule required only that a listing broker either input a listing or file a seller-signed exclusion within three days of signing.[30] On information and belief, that rule imposed no restriction on how an excluded listing could be publicly marketed. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. CCAR's restraints on competition are not about transparency, as some MLSs have argued in defense of similar rules. CCAR does not allow homesellers or homebuyers to become members or to directly search or access its database. CCAR does not accept for-sale-by-owner listings. CCAR's own rules allow listings to be hidden, just as long as they are not publicly marketed outside of CCAR.[31] Its restraints also have nothing to do with free-riding. The free-riding justification was rejected by a federal

---

[28] Cal. Civ. Code § 2079.16.

[29] 2020 Clear Cooperation Announcement.

[30] *Id.* (quoting then-current CCAR MLS Rule 7.5).

[31] *See* CCAR MLS Rule 7.6.1 (permitting an "office exclusive" only if the seller instructs the listing broker "to do no public marketing or advertising").

appellate court in nearly identical circumstances.[32] And Compass gets nothing for free. Compass agents pay CCAR dues and contribute their listings to CCAR. Moreover, even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS). On the other hand, CCAR makes listings available to third-party portals and other companies that do not contribute any listings.

25. Compass hereby brings claims against CCAR for: (1) violating the Sherman Act, 15 U.S.C. § 1; and (2) violating the Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.

**PARTIES**

26. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes & Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and "Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including California. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including California.

27. Plaintiff Compass California II, Inc. is a Delaware corporation that is licensed by the California Department of Real Estate as a corporate real estate broker and that operates as a real estate brokerage in California, including through branch offices in Oakland, Berkeley, Alameda, Fremont, Livermore, and Pleasanton, in Alameda County, and in Walnut Creek, Danville, Lafayette, and Hercules, in Contra Costa County. Its main office is located at 891 Beach Street,

---

[32] *Realcomp II, Ltd.*, 635 F.3d at 835.

San Francisco, California.[33] Compass California II, Inc. is a wholly owned indirect subsidiary of Compass, Inc.

28. Compass California II, Inc. ("Compass California II") is a participant in CCAR, is the party to the listing agreements with Compass' homeowner clients in the East Bay, and is the entity against which CCAR enforces its rules.

29. Defendant CCAR is a California mutual benefit nonprofit corporation that maintains and operates a multiple listing service, which it calls the "CCAR Multiple Listing Service."[34] On information and belief, CCAR's principal place of business is at 1870 Olympic Boulevard, Suite 200, Walnut Creek, California, in Contra Costa County.[35] CCAR has thousands of subscribers, and brokers and agents who belong to other MLSs can access its listings through the NorCal MLS Alliance and CCAR's regional cross-pollination agreement. CCAR's voting directors are licensed REALTORS® affiliated with real estate brokerages, and a large majority of them compete with Compass and its agents.

30. CCAR is a contract, combination, or conspiracy of competing agents and brokers. CCAR's participating brokers and agents compete directly with one another and with Plaintiffs for homeowner clients, homebuyer clients, and agents. Those brokers and agents follow and enforce CCAR's rules, and CCAR is governed by a Board of competing brokers and agents.

31. CCAR Rule 7.7.1 defines CCAR's MLS service area to include twenty-three Northern California counties, including Contra Costa and Alameda Counties, and Rule 7.7 makes submission of listings mandatory throughout the combined service areas of the MLSs with which CCAR has entered into cross-pollination or other regional agreements.[36] As a REALTOR® association, CCAR's territorial jurisdiction covers much of Contra Costa County.[37] CCAR

---

[33] Public License Lookup, License ID 01527235 (Compass California II, Inc.), Cal. Dep't of Real Estate, https://www2.dre.ca.gov/PublicASP/pplinfo.asp?License_id=01527235.

[34] CCAR MLS Rules 1, 3; CCAR Bylaws art. XVIII, §§ 1, 5.

[35] Cal. Sec'y of State, Statement of Information, Contra Costa Association of Realtors, Entity No. 0195401 (filed July 13, 2026); CCAR Home Page.

[36] CCAR MLS Rules 7.7, 7.7.1.

[37] CCAR Bylaws art. IV, § 1.

identifies itself, Bay East, and BridgeMLS as the MLSs serving the East Bay, and the three share a single listing platform on which a listing entered once is distributed automatically to each of them.[38]

**DEFENDANT'S CO-CONSPIRATORS**

32. Competing agents, including those enforcing CCAR's rules and members of CCAR's Board of Directors, conspired with each other and CCAR to design, approve, enforce, and implement CCAR Rules 7.5 and 7.5(a). On information and belief, CCAR has encouraged other MLSs to adopt and maintain rules similar to Rules 7.5 and 7.5(a).

33. CCAR's co-conspirators also include the other MLSs with which CCAR shares its listing platform, its data, and its rules, including Bay East and BridgeMLS. Through the NorCal MLS Alliance, launched on January 20, 2021, CCAR, Bay East, BridgeMLS, and four other Northern California MLSs integrated their listing data so that a listing entered once on the shared platform is distributed to each participating MLS.[39] The Alliance MLSs' rules committees also developed a set of "Common MLS Rules," including a uniform deadline for submitting listings to the MLS and a uniform deadline for submitting the form a seller must sign to keep a listing off the MLS.[40] And under CCAR Rule 6.1, CCAR, Bay East, BridgeMLS, and other California MLSs, including MetroList, BAREIS, MLSListings, CLAW, and CRMLS, are parties to a regional "Cross Pollination Agreement," under which each organization's listing data is displayed in the MLS systems of all the others.[41] CCAR, Bay East, and BridgeMLS also jointly set MLS policy through an MLS Management Group made up of representatives of all three, which reviews, recommends, and implements MLS rules, tools, and system changes that apply across all three MLSs.[42]

---

[38] Alliance Page; *see also Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV, ECF No. 28 ¶ 33 (S.D.N.Y. Oct. 30, 2026) (alleging that BridgeMLS's service area covers Alameda and Contra Costa Counties).

[39] Alliance Page.

[40] Common MLS Rules items 1–2, NorCal MLS Alliance, https://assets-ccartoday.s3.us-west-1.amazonaws.com/_pdfs/mls/norcal_alliance_common_rules.pdf (linked from Alliance Page) ("Common MLS Rules"); Alliance Page.

[41] CCAR MLS Rule 6.1.

[42] Bay East Ass'n of REALTORS®, Bylaws art. XVII, §§ 1(a), 2, at 37 (rev. May 28, 2025) (providing that the Bay East MLS is "operated under the supervision of the Bay East MLS / Contra

34. BridgeMLS requires its participants to submit listings, and restricts public marketing, on terms materially identical to CCAR Rules 7.5 and 7.5(a).[43] Bay East does the same.[44] And BridgeMLS has coordinated with other MLSs to defend and maintain rules materially identical to CCAR's, including by joining other MLSs in a lawsuit against Compass in the Southern District of New York seeking a declaration that those rules are lawful and an injunction barring Compass from challenging them.[45]

35. CCAR's co-conspirators performed acts and made statements in furtherance of CCAR's anticompetitive conduct. CCAR is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

36. **Jurisdiction.** This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from CCAR's and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

37. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and has supplemental jurisdiction over Compass' state-law claim under 28 U.S.C. § 1367(a) because that claim arises from the same nucleus of operative fact as the federal claims.

38. This Court has personal jurisdiction over CCAR because its headquarters and principal place of business are in this District, and CCAR conducts substantial business in this District.

---

Costa MLS / bridgeMLS combined Multiple Listing Service Group (MMG)"); Committees, Bay East Ass'n of REALTORS®, https://bayeast.org/committees/ (describing the MLS Management Group as "a joint group between Bay East, BridgeMLS, and Contra Costa Association of REALTORS®"); April 2022 Archives, Bay East Ass'n of REALTORS®, https://bayeast.org/2022/04 (reporting that the MLS Management Group, "consisting of representatives from Bay East, Contra Costa, and bridge MLS," adopted new MLS Rule 12.6.1 and Paragon system changes effective May 24, 2022).

[43] BridgeMLS, Inc., Rules and Regulations R. 7.5, 7.5.1 (eff. June 2026) ("BridgeMLS Rules").

[44] Bay East Ass'n of REALTORS®, MLS Rules and Regulations R. 7.5, 7.5.1, 7.6.1 (eff. Oct. 26, 2026) ("Bay East MLS Rules").

[45] Compl., *Ariz. Reg'l Multiple Listing Serv.*, ECF No. 1 (Oct. 21, 2026); *id.*, ECF No. 28.

39. **Venue.** Venue is appropriate in this District because CCAR's headquarters and principal place of business are in this District and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this District. 28 U.S.C. § 1391(b)(1)–(2); 15 U.S.C. § 22. CCAR initially registered as a corporation with the California Secretary of State in 1944 and lists its mailing address and agent for service of process in this District.[46]

40. **Divisional Assignment.** This action arises in Contra Costa County, where CCAR is headquartered and where a substantial part of the events or omissions giving rise to the claims occurred, including the adoption and enforcement of CCAR Rules 7.5 and 7.5(a). Under Civil Local Rule 3-2(c)–(d), this action is properly assigned to the San Francisco Division or the Oakland Division. Plaintiffs respectfully submit that the Oakland Division is appropriate.

## TRADE AND COMMERCE

41. CCAR has entered into written agreements with each of its thousands of participants and subscribers. Those brokers and agents use CCAR's MLS to market and sell thousands of residential homes and condominiums, with total closings valued in the billions. These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

## RELEVANT MARKETS

42. **Relevant Product Markets.** There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent Services Market"); and (3) provision of multiple listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

---

[46] Cal. Sec'y of State, Statement of Information, *supra* note 35; Cal. Sec'y of State, Business Search, Entity No. 0195401 (initial filing July 26, 1944).

a. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control CCAR compete in the Brokerage Services Market.

b. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control CCAR compete in the Agent Services Market.

c. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data-sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of multiple listing services likely would undertake at least a small but significant and non-transitory

increase in price or other worsening of terms. CCAR participates in the MLS Market.

43. **Relevant Geographic Market.** The relevant geographic market for each of the defined product markets is no larger than the East Bay, the area that CCAR identifies as served by CCAR, Bay East, and BridgeMLS, the three MLSs that share its listing platform.[47] A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms.

44. Brokers and agents cannot avoid CCAR's rules by using a neighboring MLS or an MLS with a data-sharing agreement with CCAR for several reasons:

a. Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

b. CCAR's rules provide that, under CCAR's reciprocal and regional agreements with other MLSs, its participants and subscribers agree to abide by the rules of the other MLSs that receive and publish a listing under such agreements, and to abide by those rules when accessing the other MLSs' databases.[48]

c. CCAR Rule 7.7 provides that if CCAR has entered into regional MLS agreements, data-share agreements, cross-pollination agreements, or a regional MLS corporation with other MLSs, submission of listings is mandatory for the combined service areas of all the signatories, and that submitting a listing to an MLS that has a cross-pollination agreement with CCAR satisfies the requirement.[49]

---

[47] Alliance Page; *see also* CCAR Home Page (depicting, under the heading "Service Area," a regional map on which Contra Costa and Alameda Counties together form the "East Bay").

[48] CCAR MLS Rule 6.

[49] CCAR MLS Rule 7.7.

d. CCAR rules apply to all agents and listings affiliated with a "listing broker," which means that every listing by an agent affiliated with a brokerage must be given to CCAR, even if the agent is not a member of CCAR, does not submit the listing to CCAR, and the homeowner does not want it in CCAR. Even if the brokerage has only a single agent who needs to access CCAR, all of the listings the brokerage obtains through its affiliated licensees are subject to CCAR's rules. Specifically, CCAR Rule 7.5 requires Broker Participants to input listings located in the MLS service area, and under CCAR Rule 4.6, whenever the rules refer to the listing broker, the term includes any subscriber or licensee retained by the listing broker, without relieving the listing broker of responsibility.[50] Thus, if one agent in a brokerage needs CCAR access, then all agents in that brokerage are bound by CCAR's rules.

45. To serve their clients and compete in the East Bay, brokers and agents must have access to CCAR, or to one of the MLSs that share its listing platform and rules, and follow CCAR's rules or materially identical ones. Thus, in both the Brokerage Services Market and the Agent Services Market, the brokers and agents that combine to adopt, follow, and enforce the CCAR rules collectively have market power. In the MLS Market, CCAR—together with Bay East and BridgeMLS, with which it shares a single listing platform—has market power. CCAR itself calls its MLS "the engine behind the local residential real estate market."[51]

46. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in almost every relevant market."[52] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . .

---

[50] CCAR MLS Rules 4.6, 7.5.

[51] CCAR Home Page.

[52] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), *reprinted in* 73 Fed. Reg. 36,104, 36,105 (June 25, 2008).

MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[53]

## FACTUAL ALLEGATIONS

**MLSs and the Antitrust Laws**

47. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. CCAR describes its MLS as "a means by which authorized MLS broker participants establish legal relationships with other participants" and as "a facility for the orderly correlation and dissemination of listing information among the participants."[54] In operating its MLS, CCAR:

a. Collects listing information from its broker participants and subscribers, who license CCAR to include that information in CCAR's copyrighted MLS compilation.[55]

b. Accumulates and disseminates that information, including sold and comparable data, so that participants can prepare appraisals and other valuations of real property.[56]

c. Correlates and disseminates listing information among its participants, and among the participants of the other MLSs with which it has cross-pollination agreements.[57]

48. MLSs also make and enforce rules. CCAR invites competing agents to help enforce its rules: it provides a process for reporting violations confidentially, and its Grievance Committee, made up of competing REALTORS®, reviews alleged violations of its MLS rules, including Rules 7.5 and 7.5(a).[58]

---

[53] DOJ & FTC, *Competition in the Real Estate Brokerage Industry* 12 (Apr. 2007) ("2007 DOJ/FTC Report"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

[54] CCAR MLS Rule 2.

[55] CCAR MLS Rules 7.5, 11.4.

[56] CCAR MLS Rules 2, 11.3.

[57] CCAR MLS Rules 2, 6.1.

[58] CCAR MLS Rules app. B ¶ J; CCAR Committees Page; CCAR Bylaws art. XII, § 1.

49. In addition to operating this members-only database, some MLSs, like CCAR, sell agent and homeowner data to third parties and distribute it to others, such as real estate web portals, which monetize it in various ways, e.g., selling leads for potential buyers to agents by displaying the data on websites with advertising alongside, and by creating tools to recruit agents from brokerages. CCAR participates as a licensor in REdistribute, a venture founded by two other MLSs that sells MLS listing data to lenders, insurers, and other institutional buyers and shares the resulting revenue with the participating MLSs.[59]

50. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are composed of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs, and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

51. MLSs are private companies. Unlike agents, MLSs do not owe fiduciary duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently pro-consumer, pro-competitive institutions; they are organizations of competing agents that make rules governing competition among them. MLSs enforce those rules by fining and punishing their own customers.

---

[59] REdistribute About Page (identifying CRMLS and Bright MLS as REdistribute's founders and listing CCAR among its "MLS Licensors"); CRMLS REdistribute Page (describing REdistribute as a joint venture founded by CRMLS and Bright MLS that distributes MLS data to institutional users in fields "such as insurance, mortgage lending, etc.," and stating that "the revenue generated from data use by licensees will be shared back with the brokers and MLS organizations that participate").

52. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[60] As the FTC noted in its seminal report on U.S. residential real estate, control over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[61] That control has been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

53. In the 1940s, the DOJ brought civil and criminal charges against MLSs that fixed commission rates.[62] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[63] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[64]

54. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies have challenged . . . as antitrust violations, MLS rules that unreasonably restrict competition by

---

[60] *Realty Multi-List*, 629 F.2d at 1370.

[61] Butters Report at 92–93.

[62] *See Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 487.

[63] *Realcomp II, Ltd.*, 635 F.3d at 819.

[64] *Consol. Multiple Listing Serv., Inc.*, 2009 WL 3150388, at *2.

brokers who use alternative business models."[65] For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-for-service brokers were not denied MLS access.[66]

55. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC described in its report:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[67]

56. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling residential properties to the MLS: the "office exclusive."[68] Specifically, the antitrust policy expressly provided that "MLS shall not: *Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'*"[69] Point 10 provided that "MLS shall not: *Make any rule regulating the advertising or promotion of any listing*."[70] The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract

---

[65] 2007 DOJ/FTC Report at 63; *see also Realty Multi-List*, 629 F.2d 1351; *Realcomp II, Ltd.*, 635 F.3d 815.

[66] 2007 DOJ/FTC Report at 64 (describing and citing cases).

[67] Butters Report at 109.

[68] *Id.* at 130.

[69] *Id.* at 134 n.354 (emphasis added).

[70] *Id.* (emphasis added).

as they see fit."[71] The term "office exclusive" just meant the listing was not provided to the MLS, and before CCAR adopted Rule 7.5(a) in 2020, CCAR's mandatory-submission rule did not restrict how a homeowner could market the home.[72] Therefore, CCAR's mandatory-submission rules cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid CCAR's restrictions or market their homes how they choose under CCAR Rules 7.5 and 7.5(a).

**CCAR Rules 7.5 and 7.5(a)**

57. CCAR's rules are designed and approved by competing brokers and agents. Under CCAR Rule 3, the MLS is governed by an MLS Committee, all of whose actions are subject to the approval of CCAR's Board of Directors, and under CCAR Rule 18, the MLS rules may be amended by a two-thirds vote of all members of the MLS Committee, subject to the Board's approval.[73] CCAR's Bylaws require every member of the MLS Committee to be an MLS participant or subscriber and a REALTOR® member of CCAR, and they require every voting director to hold a California real estate license or appraisal credential and to be a REALTOR® member of CCAR.[74] No more than three elected directors and officers may come from any one firm or franchise organization.[75] CCAR's current voting directors are affiliated with real estate brokerages, and a large majority of them are affiliated with brokerages that compete with Compass.[76] The Board appoints the MLS Committee and sets its composition, and every member of the MLS Committee must be an MLS participant or subscriber—that is, a broker or agent who competes for clients and agents in CCAR's service area.[77] On information and belief, a majority of the MLS Committee's members are affiliated with brokerages that compete with Compass.

[71] *Id.* at 130.

[72] 2020 Clear Cooperation Announcement.

[73] CCAR MLS Rules 3, 18; *see also* CCAR Bylaws art. XVIII, § 5.

[74] CCAR Bylaws art. XVIII, § 6; *id.* art. X, §§ 3, 8(a).

[75] *Id.* art. X, § 8(e).

[76] *2026 CCAR Board of Directors*, *supra* note 16.

[77] CCAR Bylaws art. XVIII, § 6.

58. Rule 7.5 requires the listing broker to input into the MLS every exclusive right-to-sell or seller-reserved listing of one-to-four-unit residential property or vacant lots in the MLS service area within two days after the seller signs the listing agreement (or the listing's start date, if later), and within one business day after the property is first marketed or advertised to the public. Rule 7.5 defines public marketing and advertising to include conveying any information about the property or its availability for sale through windows, signs, public-facing websites, social media, brokerage or franchise websites, email, text, or phone campaigns, social-media messaging, multi-brokerage or franchise listing-sharing networks, flyers, publicly available applications, or an open house. Rule 7.5(a), titled "Clear Cooperation," repeats the one-business-day deadline and defines "the public" to include anyone outside the listing brokerage and its clients.[78] The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

59. If a CCAR participant violates CCAR's rules, CCAR can punish the real estate agent and/or brokerage by levying fines or blocking their access to the listings database.[79] Under CCAR's "Citation Policy," failing to input a listing as Rule 7.5 requires, or failing to provide a seller's signed office-exclusive certification, is a "Tier Two" offense: after a warning letter for the first violation in a calendar year, CCAR fines the violator $250 for the second violation and $2,000 for the third and each later violation, which also brings an automatic thirty-day suspension from the MLS—more than CCAR imposes for "Tier One" offenses such as failing to report a sale on time.[80] A violation not corrected within two calendar days of notice counts as a new violation and may result in the listing's removal; accumulated fines for a single violation may reach $15,000; and any participant or subscriber with more than three violations in a calendar year must attend a disciplinary hearing. The Citation Policy also gives CCAR discretion to proceed by hearing

---

[78] CCAR MLS Rules 7.5, 7.5(a).

[79] CCAR MLS Rules 14.1–14.3.

[80] *Id.* app. B ¶ K.

instead, with the possibility of "additional fees or fines, suspension or expulsion."[81] CCAR polices its rules, as do CCAR's members.

60. CCAR cannot attribute these rules to NAR. CCAR chose its own enforcement terms. NAR's guidance states that "[c]ompliance is up to local determination," and CCAR's MLS Committee and Board—not NAR—set CCAR's fine schedule, its automatic suspensions, and its deadlines.[82] CCAR's deadlines are stricter even than those CCAR and the other NorCal MLS Alliance members developed as their Common MLS Rules: the Common MLS Rules allow three days to submit a listing and three days to submit a seller's exclusion form, but CCAR requires submission within two days after the seller signs, or within one business day of any public marketing, and requires a seller's office-exclusive certification within one business day.[83] By March 2022, CCAR had added its two-day submission deadline,[84] and, effective September 24, 2025, it shortened its office-exclusive certification deadline from three days to one business day.[85]

**See It First™ on Compass**

61. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take a number of different forms. Historically, "office exclusives" were a practice of publicly marketing a property off the MLS. Another alternative is a "Coming Soon" listing, where a listing is available to other participants in the MLS and may be posted to an agent's website or to other selected websites.

---

[81] *Id.* app. B ¶¶ D, I, K.

[82] MLS Clear Cooperation Policy, Nat'l Ass'n of REALTORS®, https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy (FAQ: "How can an MLS address compliance?"); CCAR MLS Rules 14.3, 18 & app. B.

[83] Common MLS Rules items 1–2; CCAR MLS Rules 7.5, 7.5(a), 7.6.1.

[84] MLS Rules & Regulations Changes – Mar. 1, CCAR (Feb. 2, 2022), https://ccartoday.com/mls-rules-regulations-changes-mar-1.

[85] *MLS Rules & Regulations Changes – Effective Sep. 24*, CCAR (Aug. 19, 2025), https://ccartoday.com/mls-rules-regulations-changes-effective-sep-24 ("2025 Rule Change Announcement").

62. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals. Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing Strategy. Compass agents offer See It First™ on Compass to clients everywhere it is permitted, although CCAR impedes that competition to protect its members, who are Compass' competition.

63. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[86] acknowledging that the listing will not initially appear in the active MLS feed.

64. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

65. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass advertises "Coming Soon" listings on its own website and also distributes them to Redfin.com, a third-party real estate site, which combined have over 50 million monthly active users. Coming Soon status signals to prospective buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

---

[86] These disclosures are available at https://www.compass-homeowners.com.

66. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

67. The listing is the homeowner's advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever they want in the listing to sell the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into their advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner. But the MLS forces the homeowner's advertisement—the listing—to contain things that are not required by the law and that no reasonable homeowner would want in their listing, including days on market and history of price changes.

68. The phased marketing strategy has several advantages for homeowners.

a. First, because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their bargaining leverage relative to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

b. Second, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations, cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

c. Third, MLSs publish the number of days a listing has been on the MLS, and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their strategy without incurring days on the market.

d. Fourth, pre- and off-MLS marketing offer the chance to sell a house without the inconvenience that comes with publicly listing it for sale and offer the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market. Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

69. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks associated with pre-sale improvements, while retaining the option to accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly and was able to secure a buyer within a short period, without dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals. At least nine agents in Northern California who recently joined Compass cited its inventory strategy and phased marketing as reasons for doing so.

70. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active MLS feed, properties marketed through Compass' phased marketing strategy sold for 4.6% more, had 34% fewer days on the MLS, and experienced 29% fewer price cuts. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

71. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025, approximately 48% of Compass

homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to CCAR's Rule 7.5 and Rule 7.5(a) in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition by reducing pre-MLS marketing, but the court held both that Zillow failed to prove its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[87]

72. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such marketing. MLSs serving more than 350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

**Anticompetitive Effects**

73. CCAR Rules 7.5 and 7.5(a) restrain trade in several ways.

a. First, because CCAR's participating brokers and agents (including Board members) compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of CCAR Rules 7.5 and 7.5(a) block competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported in its landmark study of residential real estate in the United States, "On its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[88]

---

[87] *Zillow Grp., Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-5451, 2026 WL 2720641, at *22 (N.D. Ill. Sept. 15, 2026), ECF No. 141.

[88] Butters Report at 130.

b. Second, CCAR is blocking competition by other public marketing methods, identified by CCAR Rule 7.5 as including signs, public-facing websites, social media, brokerage or franchise websites, email and text campaigns, multi-brokerage or franchise listing-sharing networks, flyers, publicly available applications, and open houses, and most significantly the Compass website itself.

c. Third, CCAR Rules 7.5 and 7.5(a) also reduce competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

d. Fourth, CCAR Rules 7.5 and 7.5(a) further reduce competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

**CCAR's Justifications Are Pretextual**

74. CCAR has no valid justification for its illegal conduct. CCAR operated without these restrictions until May 1, 2020, and many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. These rules are not required for operating a successful MLS. These are not rules that ensure the integrity of the data distributed by CCAR or prohibit its members from selectively editing or excluding the CCAR listings they show their buyer clients. CCAR Rules 7.5 and 7.5(a) govern marketing itself and require brokers and their clients to forgo profitable strategies on pain of being fined by or excluded from the MLS.

75. CCAR's restraints on competition are not about transparency, as some MLSs have averred in defense of similar rules. CCAR does not allow homeowners or homebuyers to become members or to directly access its database. CCAR does not accept for-sale-by-owner listings. And CCAR's own rules allow listings to be hidden, just as long as they are not publicly marketed.[89] Nor are CCAR's restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without

[89] *See* CCAR MLS Rules 7.6.1, 10.1 ("Sold Off MLS" status).

hiring a Compass agent. Indeed, without See It First™ on Compass as an option, some homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

76. CCAR's restraints also have nothing to do with "free-riding." MLSs like CCAR claim that brokers who publicly market listings before submitting them to the MLS are "free-riding" on the contributions of other participants.[90] That is nonsense. In the first place, Compass does not seek special treatment. If Compass has its way, every member of CCAR will be free to offer pre- and off-MLS marketing strategies to their clients.

77. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass agents provide value to CCAR and its members in critical ways, including by paying dues, exposing their buyer clients to listings submitted by other members, and submitting listings to CCAR for the benefit of all buyer agents in the East Bay after the first two phases of the phased marketing strategy, which would happen for over 93% of all pre-marketed listings based on experience elsewhere.

78. MLSs like CCAR assert other arguments about the purported drawbacks of pre- and off-MLS marketing[91] that amount to little more than paternalistically telling homeowners and their agents what is best for them. Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

79. CCAR's purported alternatives do not cure the restraint. CCAR Rule 7.6.1, which permits an "office exclusive" listing, requires the seller to instruct the listing broker to do no public marketing or advertising of any kind—no yard sign, no website, no social media post, and no open house—and requires the broker to file the seller's signed certification with CCAR within one business day. CCAR's "Coming Soon" status requires disclosure of the listing to every MLS

---

[90] *Cal. Reg'l Multiple Listing Serv.*, ECF No. 13 ¶ 51(d).

[91] *See id.* ¶ 51.

participant and expires after thirty days.[92] And CCAR's exemption for "open listings" requires the homeowner and the agent to give up the exclusive representation that most homeowners want and that standard California listing forms provide.[93]

**Antitrust Injury to Compass, Its Agents, and Homeowners**

80. CCAR's conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the following:

a. *Lost Commissions and Financial Harm to Brokerage*: Compass has suffered direct financial harm through lost commissions due to Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

b. *Degradation of Compass Website*: The enforcement of CCAR Rules 7.5 and 7.5(a) degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

c. *Depressed Sales Prices and Lost Sales*: By eliminating Compass' ability to pre-market and test pricing, CCAR rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

d. *Excessive Days on Market and Public Price Drops*: Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market"

---

[92] CCAR MLS Rules 7.6.1, 10.1.1(3), (12).

[93] The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025). Rule 7.6.1 is precisely the sort of "exception" that makes CCAR Rules 7.5 and 7.5(a) anticompetitive.

and price reductions on the listing, which depress sale prices and related sales commissions.

e. *Lost Agents*: Compass is unable to compete for agents by offering them a phased marketing strategy that they can offer their clients. Moreover, on information and belief, CCAR currently supplies Compass agent listing and agent transaction data to third-party software vendors, which package those data into products that brokerages buy and use to target and recruit Compass agents. The data that CCAR forces Compass and its agents to give to the MLS should not be sold to a technology company that in turn further sells that data with its agent recruitment technology. An MLS powering competitor recruitment tools strays far beyond the core mission of an MLS—it weaponizes Compass' operational data against Compass for competitor poaching.

f. *Loss of Convenience and Harm to Innovation*: Homeowners are stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

81. Compass and its agents and homeowners have thus suffered antitrust injury as a result of the rules imposed by CCAR and the agents and brokerages who control it. CCAR's rules are anticompetitive because they foreclose homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that CCAR Rules 7.5 and 7.5(a) foreclose, CCAR's rules prevent Compass from offering phased marketing to homeowners and agents in the East Bay, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one and the same: CCAR's rules prevent Compass from offering homeowners and agents innovative strategies they want.

82. Compass is therefore a proper party to bring this action. Compass' injury is direct, not derivative: it flows immediately from CCAR's rules and the threat of their enforcement against Compass agents and their homeowner clients. Compass' damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

**CCAR's Rules Prevent Compass From Offering See It First™ on Compass**

83. Because of Rules 7.5 and 7.5(a) and the escalating sanctions CCAR threatens for violating them—fines of up to $2,000 per violation, an automatic thirty-day suspension from the MLS, mandatory disciplinary hearings, and the possibility of expulsion—Compass agents in the East Bay cannot offer See It First™ on Compass as designed, and homeowners there who would choose phased marketing cannot obtain it.[94] Compass therefore loses the listings, commissions, ancillary revenue, and agent recruits that See It First™ on Compass would otherwise attract.

**CCAR's Violations Are Continuing**

84. CCAR's violations are continuing. Within the limitations period, CCAR has committed new and independent overt acts that inflicted new and accumulating injury on Compass, including: (a) on information and belief, approving amended MLS Rules, effective July 6, 2026, that retained Rules 7.5, 7.5(a), and 7.6.1 and the Citation Policy; (b) adopting amended Bylaws, effective June 26, 2026, that continue to vest control of the MLS in a Board and MLS Committee composed of competing brokers and agents; (c) on information and belief, appointing and confirming the members of its 2026 MLS, Grievance, and Professional Standards Committees; and (d) adopting, effective September 24, 2025, an office-exclusive certification deadline shorter than the one in the Common MLS Rules.[95] Each of these acts was a new and independent act, not a mere reaffirmation of a prior one: each required CCAR to make a fresh, discretionary decision to maintain or tighten Rules 7.5 and 7.5(a)—a decision CCAR was free not to make—and each inflicted new and accumulating injury on Compass. Compass seeks damages for injuries caused by acts within the

---

[94] CCAR MLS Rules 14.1–14.3 & app. B ¶¶ D, I, K.

[95] *See* CCAR MLS Rules; CCAR Bylaws; CCAR Committees Page; 2025 Rule Change Announcement.

applicable limitations periods, and its claims for injunctive relief are timely because CCAR continues to maintain and enforce Rules 7.5 and 7.5(a) today.

## CAUSES OF ACTION

### Count I

### PER SE ILLEGAL GROUP BOYCOTT

### IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

85. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

86. A large majority of the voting members of CCAR's Board of Directors are brokers or agents who are direct competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

87. Through CCAR Rules 7.5 and 7.5(a), CCAR forces Compass and its agents to forgo either (1) a critical input to their business (access to CCAR in the East Bay) or (2) the ability to offer innovative pre- and off-MLS marketing strategies to homeowners and agents.

88. The agreement by and among CCAR and its governing members to implement and enforce these rules is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because CCAR, together with the MLSs with which it shares its listing platform and rules, possesses market power in the MLS Market in the East Bay; it controls access to an input—MLS participation—that agents need to compete effectively in the East Bay; and the challenged rules lack any plausible efficiency justification, because they govern agents' marketing to the public rather than the integrity or sharing of data within the MLS.

89. As a direct and proximate result of CCAR's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## Count II

## COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

90. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

91. CCAR, Bay East, and BridgeMLS, which CCAR identifies as the MLSs serving the East Bay, operate a single listing platform there and enforce materially identical rules.[96] Membership in CCAR or one of those MLSs, and access to the shared platform, is critical for agents working in the East Bay. CCAR is controlled by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. CCAR and the agents and brokerages who control it are using their control of CCAR to restrain competition in the Brokerage Services Market and the Agent Services Market by implementing and enforcing CCAR Rules 7.5 and 7.5(a), which prevent Compass from offering See It First™ on Compass to its homeowner clients and agents and prevent any other agent from offering innovative pre- and off-MLS marketing strategies.

92. The rules' anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, including the mandatory-submission rule CCAR itself followed before May 1, 2020, which did not regulate public marketing, and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of the rules is obvious enough to warrant an abbreviated, "quick look" analysis.

93. As a direct and proximate result of CCAR's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

---

[96] *See* CCAR MLS Rules 7.5, 7.5(a), 7.6.1; Bay East MLS Rules 7.5, 7.5.1, 7.6.1; BridgeMLS Rules 7.5, 7.5.1, 7.6.1.

**Count III**

**COMBINATION IN RESTRAINT OF TRADE**

**IN VIOLATION OF THE CARTWRIGHT ACT**

**(CAL. BUS. & PROF. CODE § 16720 *et seq.*)**

94. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

95. CCAR and each member of its Board of Directors are each a "person" within the meaning of California Business and Professions Code Section 16702. CCAR's adoption, maintenance, and enforcement of CCAR Rules 7.5 and 7.5(a) is a combination of the capital, skill, or acts of two or more persons—CCAR and its competing Board members and participants have each agreed in writing to abide by and be bound by its rules—and therefore is a "trust" under Section 16720.

96. The purpose and effect of that combination is to create and carry out restrictions in trade or commerce, in violation of Section 16720(a), by preventing homeowners and their agents in California from publicly marketing listings except through CCAR's distribution and by preventing Compass from offering phased marketing in competition with CCAR's agent-members. The combination is unlawful, against public policy, and void under Section 16726.

97. The combination is a group boycott that is unlawful *per se*. Alternatively, it is an unreasonable restraint of trade because its anticompetitive effects in the relevant markets alleged above substantially outweigh any pro-competitive benefit, which in any event could be achieved through substantially less restrictive means.

98. The combination was formed and carried out in California, is enforced against agents licensed in California, and restrains the marketing of residential real estate located in California.

99. As a direct and proximate result of the combination, Compass has been injured in its business and property, including through lost listing contracts, commissions, and revenue from ancillary services, and diminished value of its technology platform. Compass' injury flows from that which makes the combination unlawful: the suppression of competition in how, when, and to whom homes are marketed.

100. Under California Business and Professions Code Section 16750(a), Compass is entitled to injunctive relief, three times its damages, interest, and its reasonable attorneys' fees and costs of suit.

**REQUESTED RELIEF**

Compass requests the following:

A. A declaration that CCAR Rules 7.5 and 7.5(a) are an unlawful restraint of trade under 15 U.S.C. § 1 and California Business and Professions Code Sections 16720 and 16726;

B. An injunction prohibiting CCAR from adopting, maintaining, or enforcing CCAR Rules 7.5 and 7.5(a), or any similar rule, to penalize any participant or subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

C. An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

D. An award of Plaintiffs' attorneys' fees and costs of suit; and

E. Such other relief as the Court deems just and equitable.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Compass hereby demands a trial by jury as to all claims so triable.

Dated: November 12, 2026

By: <u>*/s/ Joseph Tartakovsky*</u>

Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Brian Y. Chang (SBN: 287757)
bchang@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone: 408-889-1670

*Attorneys for Plaintiffs*
*Compass, Inc.*
*and Compass California II, Inc.*